# United States Court of Appeals
### For the First Circuit

No. 19-2006

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

JONATHAN MORRONE, individually and d/b/a JM International, Inc.,

Defendant, Appellant,

Z. PAUL JURBERG, individually and d/b/a Brookline Capital
Partners, Inc.; ANTHONY ORTH, individually and d/b/a Grand
Traverse Equities, Inc.; MAY'S INTERNATIONAL CORPORATION,

Defendants,

BRETT HAMBURGER, d/b/a JCBH Consulting, LLC,

Defendant/Third-Party Plaintiff,

BIO DEFENSE CORPORATION; MICHAEL LU, individually and d/b/a
May's International Corporation,

Defendants/Third-Party Defendants,

DAVID SMITH; ONEIGHTY C TECHNOLOGIES,

Third-Party Defendants.

---

No. 19-2007

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

Z. PAUL JURBERG, individually and d/b/a Brookline Capital

Partners, Inc.,

Defendant, Appellant,

JONATHAN MORRONE, individually and d/b/a JM International, Inc.;
ANTHONY ORTH, individually and d/b/a Grand Traverse Equities,
Inc.; MAY'S INTERNATIONAL CORPORATION,

Defendants,

BRETT HAMBURGER, d/b/a JCBH Consulting, LLC,

Defendant/Third-Party Plaintiff,

BIO DEFENSE CORPORATION; MICHAEL LU, individually and d/b/a
May's International Corporation,

Defendants/Third-Party Defendants,

DAVID SMITH; ONEIGHTY C TECHNOLOGIES,

Third-Party Defendants.

—————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

—————

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

—————

Steven M. Kaplan, with whom Rosenfeld & Kaplan, L.L.P. was on
brief, for appellants.
Theodore Weiman, Senior Litigation Counsel, Securities and
Exchange Commission, with whom Michael A. Conley, Acting General
Counsel, Securities and Exchange Commission, and Tracey A. Hardin,
Assistant General Counsel, Securities and Exchange Commission,
were on brief, for appellee.

May 10, 2021

**LYNCH**, **Circuit Judge**.  Appellants Jonathan Morrone and Z. Paul Jurberg were senior officers at Bio Defense Corporation, a United States company whose stated purpose was to develop and sell a machine to clean and decontaminate mail.  The United States Securities and Exchange Commission ("SEC") alleged that Morrone and Jurberg solicited investments in Bio Defense from investors in violation of the federal securities laws.  The district court granted in part summary judgment in the SEC's favor.  SEC v. Bio Def. Corp., No. CV 12-11669-DPW, 2019 WL 7578525, at *35 (D. Mass. Sept. 6, 2019).  On appeal, Morrone and Jurberg argue that the district court erred in applying the U.S. federal securities laws to their solicitation of foreign investors in light of the Supreme Court's decision in Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010).  Alternatively, they argue that genuine issues of fact precluded entry of summary judgment in favor of the SEC on some of its claims.  We find no error and affirm.

## I. Facts

### A. Bio Defense

Bio Defense is a Delaware corporation with its principal place of business in Massachusetts.  It was founded in 2001 by Michael Lu in response to the widely publicized mailing of letters containing anthrax after the September 11, 2001 terrorist attacks.  Lu said that he wanted Bio Defense to manufacture a machine, the

- 4 -

MailDefender, capable of decontaminating letters of biological pathogens.

Morrone joined Bio Defense[1] in 2002 as its Senior Executive Vice President and as a member of the company's board of directors. He had previously worked as a licensed registered representative at various broker-dealers. Bio Defense paid Morrone through JM International, Inc., a corporation Morrone controlled.

Jurberg joined Bio Defense around 2003 as a senior officer. Like Morrone, he had previously worked as a registered representative at various broker-dealers. Jurberg was also the president of Brookline Capital Partners, Inc., the entity through which Bio Defense paid him.

In addition to Morrone and Jurberg, Bio Defense made two other hires relevant to this appeal. First, it hired Brett Hamburger in 2002 or 2003 as a consultant to help generate leads for prospective investors. Bio Def. Corp., 2019 WL 7578525, at *1. Hamburger had previously worked as a registered representative for various brokerage firms. Id. at *2-3. However, in 2000, he was barred by the National Association of Securities Dealers for acting as an unregistered broker, and in 2003, he was convicted of conspiracy to commit securities fraud for activities unrelated to

---

[1] Bio Defense was previously called Life Max. Life Max became Bio Defense at some point in the early 2000s.

Bio Defense. Both Morrone and Jurberg knew of Hamburger's conviction.[2] Id. at *31. Bio Defense paid Hamburger through JCBH Consulting, LLC, which he controlled. Second, Bio Defense hired Anthony Orth in 2005 or 2006 to assist with sales and marketing. Id. at *1. He eventually became a Vice President. Id. Orth was paid through Grand Traverse Equities, Inc., a company he controlled. Id. at *2 & n.2.

Bio Defense never earned a profit and lost at least $2 million each year. Id. at *2. In total, it sold around ten MailDefender machines and brought in only $430,000 from these sales over a six-year period. Id. In contrast, it raised almost $25 million from stock sales to private investors over the same period.

B. Domestic Fundraising (2004-2008)

After joining Bio Defense, Morrone, Jurberg, and Orth solicited individual domestic investors to purchase Bio Defense stock and collected "consulting fees" for doing so. Id. Bio Defense stock was not registered with the SEC from 2004 to 2010. Id. at *2, *13. We limit our discussion to events that occurred after September 10, 2007.[3]

---

[2] Jurberg disputed before the district court that there was evidence he knew of Hamburger's conviction. The district court found that he did, see Bio Def. Corp., 2019 WL 7578525, at *31, and Jurberg does not dispute this finding on appeal.

[3] Citing the Supreme Court's decision in Kokesh v. SEC, 137 S. Ct. 1635, 1642-45 (2017), the district court held that the SEC "may not seek monetary penalties, disgorgement, injunction, or

- 6 -

On October 3, 2007, Morrone, Jurberg, and Orth participated in a conference call for prospective investors and touted Bio Defense stock. Orth told investors that governmental interest in the MailDefender was growing exponentially and that Bio Defense had already sold units to the United Nations, Department of Defense, Reuters, and other organizations. Morrone told investors that various federal agencies had already committed to purchasing 300 units of the MailDefender and that the military wanted Bio Defense to be able to produce 250 units a month. Jurberg talked about the company's prospects abroad and said that Bio Defense was authorized to sell units in Italy. All three also said that Bio Defense would be an attractive acquisition target. Morrone and Jurberg specifically mentioned a well-known mailing equipment and technology company as a potential acquirer.

Additionally, from December 2007 to February 2008, by phone, fax, and mail, Jurberg helped various investors transfer money from their existing Individual Retirement Accounts ("IRAs")

---

an officer/director bar for any fraudulent conduct that occurred prior to September 10, 2007" because the SEC filed its complaint on September 10, 2012. Bio Def. Corp., 2019 WL 7578525, at *11. When the district court ruled, a five-year limitation period applied to the SEC's claims. On January 1, 2021, Congress extended the statute-of-limitations period to ten years. See National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4625-26 (Jan. 1, 2021). The changed statute of limitations does not impact this case.

into new accounts so that they could purchase Bio Defense stock. Id. at *14 n.22.

An enforcement attorney at the Texas State Securities Board participated in the October 2007 conference call as part of an investigation into Bio Defense's offering and sale of securities in Texas. The Texas State Securities Board contacted Bio Defense. Lu, Morrone, and Jurberg agreed to the entry of a cease and desist order against them and Bio Defense for offering unregistered shares through unregistered agents. Morrone and Jurberg admitted to the findings of fact and conclusions of law in the cease and desist order.

In 2008, Massachusetts also opened an investigation into Bio Defense's offering of unregistered securities in Massachusetts. Partially as a result of this investigation, and on the advice of legal counsel, Bio Defense decided to stop selling its securities to U.S.-based investors.

C. International Fundraising (2008-2010)

In 2008, Hamburger introduced Bio Defense to Agile Consulting ("Agile"). Agile ran call centers targeting investors in Europe, and Hamburger told Lu, Morrone, and Jurberg that Agile could help them raise money from foreign investors. He said it would be "very expensive" and that Agile charged a 75% fee for any investor funds that it raised. Hamburger acted as an intermediary

between Agile and Bio Defense. Bio Defense entered into an agreement with Agile on August 1, 2008.

Shortly thereafter, Lu, Morrone, and Jurberg met with Bio Defense's outside counsel, Barbara Jones. Jones says that Lu, Morrone, and Jurberg explained the agreement to her without telling her that Bio Defense had already entered into it and without showing the agreement to her. Based on this conversation, she said she advised the company not to enter the agreement. She said she told Lu, Morrone, and Jurberg that the fact that Bio Defense would receive such a small portion of any investment was an "absolutely critical disclosure that would need to be made to any potential investor."

On August 6, 2008, after reviewing the agreement, Jones sent an email to Lu, Morrone, and Jurberg saying that "the cost of [Agile's] funding is exorbitantly high" and that "no legitimate, professional consulting group would charge" such a high fee.[4] She called Agile's fee "usurious" and said that "[f]uture investors would reasonably question the judgment of management and the Board in permitting the Company to undertake such an obligation."

Meanwhile, Morrone, Jurberg, Orth, and Hamburger prepared to work with Agile. In July 2008, Orth emailed Morrone

_____

[4] The agreement itself does not mention the 75% fee. Jones says she learned the amount of the fee at her meeting with Lu, Morrone, and Jurberg.

- 9 -

and Jurberg a call script for soliciting investors, which Morrone and Jurberg both forwarded to Hamburger. Hamburger said that the script "was given to [him] by Paul Jurberg at the company to give to [Agile]" and that the script was "also sent to me from Jonathan Morrone as well." Hamburger sent Agile the script, which did not mention the 75% fee Bio Defense agreed to pay to Agile.

In August 2008, Morrone sent a bullet-point list of "Key Corporate Updates" and a stock subscription agreement to Hamburger, who at the time was meeting with Agile in Spain. The stock subscription agreement did not mention Agile's fee. It also said that "[t]he Company shall have no obligation hereunder until the Company shall execute and deliver to the Purchaser an executed copy of this Subscription Agreement and until the closing conditions . . . have been satisfied."

Additionally, Morrone sent Hamburger a cover letter, signed by Morrone, to accompany any subscription agreement. He discussed edits to the letter with Hamburger and sent him instructions on how investors could send payments to Bio Defense.

In what became known as the "EU Project," Agile began soliciting investors through its call centers using the documents Morrone and Jurberg provided from the U.S. to Hamburger. Once Agile found investors interested in Bio Defense, it would send their names and contact information to an email account Hamburger could access. The information was then sent to both Morrone and

- 10 -

Jurberg, who would send subscription agreements from the U.S. to the potential investors. When the investors signed the subscription agreements and sent them to either Morrone or Jurberg in Boston, they processed the documents, brought the agreements to Lu, who was also in Boston, so that he could counter-sign them, then mailed Bio Defense stock certificates from Boston to the investors. Bio Def. Corp., 2019 WL 7578525, at *4. After paying Agile a 75% commission, Bio Defense paid Hamburger an additional 12.5% commission from the remaining funds (about 3% of the total amount received from investors) and made commission payments to Morrone, Jurberg, and Lu. Id. Bio Defense was left with less than 25% of the funds invested. Bio Defense would pay Agile and Hamburger weekly, and its financial controller would send a weekly report detailing these payments to Hamburger, Lu, Morrone, and Jurberg. The EU Project ran from August 2008 to February 2009. Bio Defense raised around $3.3 million and paid around $2.5 million to Agile.

Bio Defense also engaged in three other similar schemes, including the payment of fees of either 70% or 75%, with companies other than Agile. In addition to the EU Project, Hamburger managed the "PT Project," which ran from December 2008 to October 2010 and raised approximately $3.3 million. Id. at *5. Orth managed the "CA Project" and the "GH project," which operated from March 2009 to July 2010 and April 2010 to September 2010, respectively. Id.

- 11 -

The CA Project raised about $5 million, while the GH project raised about $118,000. Like for the EU Project, Lu, Orth, Morrone, and Jurberg all received weekly updates on the subscription agreements entered into as part of these projects.

An SEC forensic accountant submitted a declaration saying that Bio Defense paid $607,928 in commissions to Morrone and $576,798 in commissions to Jurberg within the statute-of-limitations period. Based on the timing of these payments, some of the commissions were related to their domestic fundraising activities and some were related to their international fundraising activities.

While these projects were ongoing, Morrone, Jurberg, Orth, and Hamburger received numerous complaints from investors about Bio Defense's solicitation practices. The chairman of Bio Defense's advisory board also alerted Morrone to numerous complaints he had received about Bio Defense's "boiler room tactics" related to the call centers.

## II. Procedural History

The SEC filed a complaint against Bio Defense, Lu, Morrone, Jurberg, Hamburger, and Orth alleging violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5. Relevant to this appeal, it alleged that Morrone and Jurberg (1) violated §§ 5(a) and 5(c) of the Securities Act by offering and selling

unregistered securities through interstate commerce and the mails, see 15 U.S.C. § 77e(a), (c); (2) violated § 15(a) of the Exchange Act by offering and selling securities without registering as brokers, see 15 U.S.C. § 78o(a)(1); (3) violated § 17(a)(1) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 by substantially participating in a scheme to defraud investors, see 15 U.S.C. § 77q(a)(1); 15 U.S.C. § 77j(b); 17 C.F.R. § 240.10b-5(b); (4) violated § 17(a)(2) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 by making materially false and misleading statements in the offer or sale of securities; and (5) violated § 17(a)(3) of the Securities Act by "engag[ing] in any transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser," 15 U.S.C. § 77q(a)(3). Additionally, the SEC alleged that Morrone had control over Bio Defense and was liable under § 20(a) of the Exchange Act for Bio Defense's § 10(b) violation. It moved for summary judgment against Morrone, Jurberg, Hamburger, and Orth.[5] Bio Def. Corp., 2019 WL 7578525, at *1. The district court issued an order ruling on these motions on September 6, 2019. Id.

Before turning to the summary judgment motion, the court's order decided two preliminary issues. First, it held that

---

[5] Default judgment was entered against Bio Defense, Lu, and May's International Corporation. Bio Def. Corp., 2019 WL 7578525, at *35.

- 13 -

it would draw adverse inferences requested by the SEC against Jurberg and Orth, who had asserted their Fifth Amendment rights against self-incrimination during discovery, "to the extent there is other evidence to support [them]." Id. at *8. Next, it held that the federal securities laws applied to the defendants' conduct targeting international investors because "Bio Defense received the proposed subscription agreements from overseas investors, . . . Lu counter-signed them in Bio Defense's Boston office before mailing the stock certificates to the investors[,] . . . [and] Bio Defense . . . incurred irrevocable liability within the United States." Id. at *12.

The court then granted partial summary judgment to the SEC. It held the SEC was entitled to summary judgment on its registration claims under § 5 and § 15 and its fraudulent or deceptive practices claim under § 17(a)(3) against Morrone and Jurberg. Id. at *17-20, *25.

On the SEC's fraudulent or deceptive scheme claim under § 17(a)(1), § 10(b), and Rule 10b-5, the court ruled in the SEC's favor with respect to Morrone. Id. at *22. As to Jurberg, it found that there was "a genuine issue whether Jurberg's involvement

was so substantial that it exposes him to liability under § 10(b) and § 17(a)(1)."[6]  Id.

The court denied summary judgment in the SEC's favor on its materially false and misleading statement claims against Morrone and Jurberg under § 17(a)(2), § 10(b), and Rule 10b-5. Id. at *25-29.  It also held that the SEC was not entitled to summary judgment against Morrone on its § 20(a) control liability claim.  Id. at *29-30.

The court permanently enjoined Morrone and Jurberg from violating the federal securities laws in the future, ordered disgorgement of their commission payments, imposed civil monetary penalties, and barred them from serving as officers or directors of public companies.  Id. at *31-34.

Morrone and Jurberg timely appealed the entry of summary judgment against them on some of the SEC's claims.

### III. Analysis

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact" and is "entitled to judgment as a matter of law."  Mitchell v. Miller, 790 F.3d 73, 76-77 (1st Cir. 2015) (quoting Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 10 (1st Cir. 2013)).  We

---

[6]  The district court stated that, unlike for the § 17(a)(1) claim, "[Jurberg's] participation need not have been substantial" to expose him to § 17(a)(3) liability.  Id. at *25.

review an order granting summary judgment de novo, "drawing all reasonable inferences in the light most favorable to the nonmoving party." Id. at 76.

A. The District Court Did Not Err in Applying the Federal Securities Laws to Morrone and Jurberg

Appellants argue that the district court erred when it applied United States law to "foreign transactions involving foreign investors solicited by foreign brokerage firms." They argue that Morrison, 561 U.S. at 273, prevented it from doing so. We disagree.

Morrison held that § 10(b) of the Exchange Act does not apply extraterritorially and articulated a transactional test to determine "which transnational frauds it applie[s] to." Id. at 267 & n.9. Under this test, the federal securities laws apply to only two types of transnational transactions: (1) "transactions in securities listed on domestic exchanges," and (2) "domestic transactions in other securities." Id. at 267. Because Bio Defense was not listed on a domestic exchange, the federal securities laws apply to the transactions at issue here if they are "domestic transactions in other securities."

The First Circuit has not previously applied Morrison to determine whether a transaction is domestic. Other circuits have held that a transaction is domestic under Morrison if "irrevocable liability" occurs in the United States. See Absolute Activist

- 16 -

Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 67 (2d Cir. 2012) ("[W]e hold that transactions . . . are domestic if irrevocable liability is incurred or title passes within the United States."); United States v. Georgiou, 777 F.3d 125, 137 (3d Cir. 2015) (same); Stoyas v. Toshiba Corp., 896 F.3d 933, 949 (9th Cir. 2018) (same). Under this standard, parties to a transaction incur "irrevocable liability" if the "purchaser incurred irrevocable liability within the United States to take and pay for a security, or . . . the seller incurred irrevocable liability within the United States to deliver a security." Absolute Activist, 677 F.3d at 68. The circuits adopting the "irrevocable liability" test in this context have reasoned that, because "the point at which the parties become irrevocably bound is used to determine the timing of a purchase and sale," it "can [also] be used to determine the locus of a securities purchase or sale." Id. (emphasis added); see Georgiou, 777 F.3d at 136; Stoyas, 896 F.3d at 948; see also Riseman v. Orion Rsch., Inc., 749 F.2d 915, 918-19 (1st Cir. 1984) (applying the irrevocable liability test to determine the timing of a transaction).

We agree with the reasoning of the Second, Third, and Ninth Circuits and hold that a transaction is domestic under Morrison if irrevocable liability occurs in the United States.[7]

---

[7] We note that Morrison's transactional test only governs conduct occurring before July 22, 2010. Shortly after Morrison

- 17 -

Applying that test here, it is clear that Bio Defense "incurred irrevocable liability within the United States to deliver a security." Absolute Activist, 677 F.3d at 68. The subscription agreements for Bio Defense stock said that the company had "no obligation" under them until Bio Defense "execute[s] and deliver[s] to the Purchaser an executed copy" of the agreement. It is undisputed that these subscription agreements were executed on behalf of Bio Defense by Lu in Boston, and that either Morrone or Jurberg then issued shares from Boston to the investors. Bio Def. Corp., 2019 WL 7578525, at *4. Because Bio Defense became irrevocably liable to deliver the shares in Boston, the federal securities laws apply.

Appellants argue that the analysis does not end here. They say that even if a transaction is domestic because irrevocable liability occurred in the United States, we should adopt the Second Circuit's holding in Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE, 763 F.3d 198, 215 (2d Cir. 2014), that "a domestic securities transaction" under Morrison is "not alone sufficient to state a properly domestic claim under the statute." They argue that, under Parkcentral, the federal securities laws do

was decided, Congress amended the federal securities laws to "apply extraterritorially when the [newly-added] statutory conduct-and-effects test is satisfied." SEC v. Scoville, 913 F.3d 1204, 1218 (10th Cir. 2019); see 15 U.S.C. § 77v(c); 15 U.S.C. § 78aa(b). At oral argument, the SEC represented to us that there are "very few" cases left that will be governed by Morrison.

not apply to claims where the transactions meet the irrevocable liability test but "the claims . . . are so predominantly foreign as to be impermissibly extraterritorial." Id. at 216; see also Cavello Bay Reinsurance Ltd. v. Shubin Stein, 986 F.3d 161, 165-68 (2d Cir. 2021) (applying Parkcentral).

Like the Ninth Circuit, we reject Parkcentral as inconsistent with Morrison. See Stoyas, 896 F.3d at 950 ("[T]he principal reason that we should not follow the Parkcentral decision is because it is contrary to . . . Morrison itself."). Morrison says that § 10(b)'s focus is on transactions. 561 U.S. at 266 ("[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States."). Section 10(b) "seeks to 'regulate'" transactions and protect "parties or prospective parties to those transactions." Id. at 267 (quoting Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971)). The Court explicitly said that, if a transaction is domestic, § 10(b) applies. Id. at 267 ("[I]t is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies."). The existence of a domestic transaction suffices to apply the federal securities laws under Morrison. No further inquiry is required.

Regardless, even if we were to apply Parkcentral, the claims here are not "so predominantly foreign as to be

- 19 -

impermissibly extraterritorial." 763 F.3d at 216. Parkcentral itself cautioned that it "cannot . . . be perfunctorily applied to other cases based on the perceived similarity of a few facts." Id. at 217. Here, Bio Defense incurred irrevocable liability in the United States, but there were also significantly more U.S. connections rendering the fraud domestic. Morrone and Jurberg were both based in the United States. They conducted nearly all of their activities in furtherance of the fraud from the U.S. Further, Bio Defense was a U.S.-based company and was not traded on a foreign exchange. In contrast, Parkcentral involved significantly more foreign conduct, including transactions in a foreign company's securities traded on a foreign exchange. Id. at 215-16.

There was no error in applying the federal securities laws to Morrone and Jurberg.

B. The District Court Did Not Err in Granting Partial Summary Judgment in the SEC's Favor

The appellants next argue that alleged issues of fact precluded entry of summary judgment in the SEC's favor with respect to its § 15 unregistered brokers claim and its § 17(a)(3) anti-fraud claim under the Securities Act. Morrone also argues that the district court erred as to the SEC's § 5 claim against him and

its § 17(a)(1), § 10(b), and Rule 10b-5 claims against him. We find no error.

On the § 15 claim, the appellants argue that they had merely an administrative role in Bio Defense's unregistered offering of securities to overseas investors and did not act as brokers.[8] Section 15 makes it unlawful "for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered . . . ." 15 U.S.C. § 78o(a)(1). A broker is "any person engaged in the business of effecting transactions in securities for the account of others." Id. § 78c(a)(4). According to SEC rules, "a person may 'effect transactions,' among other ways, by assisting an issuer to structure prospective securities transactions, by helping an issuer to identify potential purchasers of securities, or by soliciting securities transactions." Strengthening the Commission's Requirements Regarding Auditor Independence, Exchange Act Release No. 34-47265, 79 SEC Docket Nos. 1284, 1571, at *18

---

[8] Appellants also say that "[t]he flaw in the District Court's analysis is that it used the conduct engaged in by Jurberg and Morrone prior to September 10, 2007 to find that they acted as brokers." This argument ignores the solicitation of domestic investors both Morrone and Jurberg were actively engaged in after September 10, 2007 on which the district court relied. We have already detailed that involvement and do not repeat it here.

n.82 (Jan. 28, 2003).  A person can be "engaged in the business" of doing so "by receiving transaction-related compensation or by holding itself out as a broker-dealer."  Id.

Morrone and Jurberg's involvement in the offering and scheme to defraud investors was far from minimal.  They were instrumental in the scheme's planning and execution and there is no genuine dispute that they were engaged in the business of effecting transactions in Bio Defense stock.  They were in the room when Hamburger first presented the scheme with Agile to Bio Defense.  They were there when Bio Defense's counsel advised against the arrangement and said that if the company did proceed it would be crucial to disclose Agile's exorbitant commission.  They helped Hamburger provide call scripts to Agile.  They received weekly reports on the scheme's progress.  They mailed subscription agreements to investors found by the call centers.  Whenever an investor signed a subscription agreement, that investor mailed the agreement back to either Morrone or Jurberg.  They handled the funds, gave the subscription agreement to Lu for his countersignature, and mailed the stock certificates to investors. Bio Def. Corp., 2019 WL 7578525, at *4.  They also received commissions based on the value of investments made by these investors.  The district court was correct to conclude that they acted as brokers for the purposes of § 15 liability.  See id. at *18.

- 22 -

Based on these same undisputed facts, there is also no genuine dispute as to whether Morrone and Jurberg "engage[d] in [a] transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser" of a security in violation of § 17(a)(3). See 15 U.S.C. § 77q(a)(3). Appellants do not dispute that Bio Defense's solicitation of investors was fraudulent. Entry of summary judgment on this claim in favor of the SEC was proper.[9]

Finally, Morrone argues that the district court erred because there were issues of fact as to whether he was a "necessary participant" or "substantial factor" in the scheme to sell unregistered securities overseas in violation of § 5 of the Securities Act. He makes similar arguments against the SEC's § 17(a)(1), § 10(b), and Rule 10b-5 claims and argues that there is an issue of fact as to whether he acted with the requisite scienter.

---

[9] Jurberg argues that it was inconsistent for the district court to find that (1) there was a genuine issue of fact as to whether he "employed" a fraudulent scheme or deceptive device under § 17(a)(1) and Rule 10b-5 but (2) there was no genuine issue of fact as to whether he "engaged in a practice or course of business" operating as a fraud under § 17(a)(3). We see no inconsistency, as "employing" a fraud and "engaging" in one are not necessarily the same. Cf. Lorenzo v. SEC, 139 S. Ct. 1094, 1102 (2019) (noting, when discussing Rule 10b-5, that "at least some conduct . . . amounts to 'employ[ing]' a 'device, scheme, or artifice to defraud'" as well as "'engag[ing] in a[n] act . . . which operates . . . as a fraud'" (alterations in original)).

- 23 -

Morrone's main argument is that the court erred in holding that there was no genuine dispute that he had substantially participated in the fraud while also holding that there was a genuine dispute as to whether Jurberg substantially participated. There is ample evidence specific to Morrone showing that he was integral to the fraud and acted with scienter. Morrone recognized that he had a responsibility to ensure that people soliciting investors made proper disclosures. He knew about the exorbitant fee the call centers were charging and was warned by counsel that it should have been disclosed. Nevertheless, he helped prepare and disseminate the information received by investors and took no steps to disclose this fee. He sent bullet points to Hamburger for the call centers to use. He sent the script used by the call centers to Hamburger. With Hamburger, he helped edit the subscription agreements that were ultimately sent to investors. He helped draft, and signed, the introductory letter sent to every investor caught up in the scheme. He took no steps to disclose the fees after being warned about the call centers and their "boiler-room tactics." There was no error.

## IV. Conclusion

Affirmed.