# United States Court of Appeals
## For the First Circuit

No. 20-1810

EDGEPOINT CAPITAL HOLDINGS, LLC,

Plaintiff, Appellant,

v.

APOTHECARE PHARMACY, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Michael D. Brier, with whom Kevin T. Peters and Gesmer
Updegrove, LLP were on brief, for appellant.
Andrew R. Dennington, with whom Julie M. Muller and Conn
Kavanaugh Rosenthal Peisch & Ford, LLP were on brief, for appellee.

July 6, 2021

LYNCH, **Circuit Judge**.  In this breach of contract action by EdgePoint Capital Holdings, LLC ("EPCH"), arising out of the sale of the defendant Apothecare Pharmacy, LLC ("Apothecare"), two primary issues were raised: one of federal securities law and one of state contract interpretation law.  On cross-motions for summary judgment the district court rejected Apothecare's federal securities law defense that the contract sued on was void under Section 29(b) of the Securities Exchange Act of 1934 ("Exchange Act").  EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC, 478 F. Supp. 3d 75, 81-82 (D. Mass. 2020).  However, it granted summary judgment in Apothecare's favor on the ground that, as a matter of Massachusetts contract interpretation law, EPCH was not entitled to the fee it sought.  Id. at 83.  We affirm the grant of summary judgment to Apothecare.  Apothecare's federal securities law defense is valid, and therefore the plaintiff EPCH may not recover.

## I. Facts

EPCH is an investment banking firm based in Beachwood, Ohio.  Most of EPCH's work is assisting companies in the selling of their businesses.  EdgePoint Capital Advisors, LLC ("EPCA") is affiliated with EPCH and together the parties refer to them as "EdgePoint."  EPCH and EPCA are legally distinct, but they are owned by the same person and share expenses, office space, and some employees.  EPCH handles asset sales and is not registered

and has never been registered as a broker-dealer. EPCA, by contrast, is a registered broker-dealer and was registered in Massachusetts at the time of the events in this case. EdgePoint benefits from using EPCH rather than its higher-cost registered arm EPCA to complete transactions that do not require a broker-dealer.

EdgePoint's practice when engaging a new client is to allocate the contract to either EPCH, its non-registered arm, or EPCA, its registered arm. It says it does this based on its view of whether the engagement will involve a securities transaction, as only registered brokers may broker securities transactions. 15 U.S.C. § 78o(a)(1). EdgePoint admits it assigns contracts from EPCH to EPCA well after it has started its efforts on behalf of its client if it comes to believe the engagement will involve a securities transaction. EdgePoint says it often looks to the Letter of Intent between its client and a prospective buyer to determine whether an EPCH contract should be reassigned to EPCA, and its practice allows contracts to be assigned "within . . . a month of closing." EdgePoint prefers to handle transactions through EPCH when possible to avoid the "[Financial Industry Regulatory Authority ("FINRA")] tax on all FINRA transactions . . . [and the] record-keeping obligations for FINRA." Because of the expense sharing agreement between EPCA and EPCH, EdgePoint also

finds it "easier to administ[er] the transactions that are done [through EPCH]."

The defendant Apothecare is a long-term care pharmacy company serving group home patients, hospice patients, and others who require special pharmaceutical packaging. Apothecare provides services to over 5,100 "beds" at more than 1,000 institutions in New England and had sales of approximately $26 million in 2015. Rudy Dajie purchased Apothecare in 2012 and served as its Chief Executive Officer until November 2019.

A. Apothecare's Dealings with EdgePoint

Sometime before December 2015, Dajie became interested in selling Apothecare. Dajie was introduced to EdgePoint in December 2015. On December 18, Daniel Weinmann, a managing director at EdgePoint employed by both EPCH and EPCA, delivered a pitch presentation to Dajie about the services EdgePoint could provide. The presentation listed "EdgePoint" as a registered broker-dealer, and Weinmann's email signature included the language "EdgePoint, Member of FINRA."

The next day, on December 19, Weinmann emailed Dajie a draft engagement letter (the "Sell-Side Agreement") listing EPCA, EdgePoint's registered broker-dealer arm, as the contracting party.

Six months later, on June 15, 2016, Weinmann sent Dajie a new draft of the Sell-Side Agreement. EdgePoint had unilaterally

revised the agreement to list EPCH, its non-registered arm, rather than EPCA as the contracting party.[1]  The file name of the revised agreement was "EPCA-Apothecare Sell-side Agreement 6-15-16," contrary to the terms of the revised agreement. (Emphasis added.) The cover message did not explain or identify this change, and stated only that "[a]ttached is the revised sell-side agreement we discussed on our call today."  The change was also not highlighted, "redlined," or otherwise emphasized in the draft.  Dajie testified that no one at EdgePoint told him that there were two separate entities, explained the distinction between EPCH and EPCA, or alerted him that the agreement had been modified to list EPCH as the contracting party.

The final Sell-Side Agreement was executed on September 6, 2016.  It stated that

> Apothecare Pharmacy, LLC and all related affiliates (collectively known as the "Seller") hereby engages and authorizes EdgePoint Capital Holdings, LLC ("EdgePoint") to assist the Seller in the sale of all or part of the Company or its assets (including real estate assets held in a related holding company) or assisting in the formation of a joint venture. Seller agrees to advise EdgePoint of any buyers, agents (i.e. Brokers, etc.), or other Transactional Partners that the Seller wishes to consider in addition to those identified by EdgePoint and agrees to

---

[1]  At his deposition Weinmann said he made the change because he "thought that [any transaction] was most likely going to be an asset sale," but that "if we later determined that we did find a buyer that was willing to do a stock transaction, we could always assign it to [EPCA]."

- 5 -

allow EdgePoint to pursue discussions with
them.
. . .
Seller agrees to engage EdgePoint as its sole
representative in the sale of Seller, and
further agrees to direct all Inquiries as to
the sale of such company(ies) to EdgePoint.
(Emphasis added.)

The Sell-Side Agreement required Apothecare to make an
initial payment of $35,000: $15,000 as a "commitment fee" and
$20,000 as an "additional" payment thirty days later. It also
specified that if a sale was made, Apothecare would be required to
pay EPCH a "Success Fee" equal to the greater of $350,000 or 1.75%
of the transaction value up to $40 million plus 7.0% of the
transaction value in excess of $40 million.

This breach of contract suit is based on the "tail
provision" of the contract, which stated that if the agreement was
terminated by either party, "[Apothecare] . . . shall be obligated
to pay [EPCH] a fee as previously outlined [if] . . . within 18
months of the date of the termination of this contract" it
completed "any Transaction with a company or individual identified
or contacted by [Apothecare] or EdgePoint during the term of this
agreement (a 'Transactional Partner')."[2]

On October 26, 2016, Matthew Lazowski, an EdgePoint
employee, sent Dajie a draft sixty-page Confidential Information

---

[2] The Sell-Side Agreement also included an indemnification
provision which is the basis for EPCH's attorneys' fees claim.

Memorandum ("CIM"). The following day, Lazowski sent Dajie a "Potential Buyers List" of approximately four hundred companies. Clearview Capital, LLC ("Clearview") and Starboard Capital Partners, LLC ("Starboard") were on the list.

The CIM is a marketing document designed to inform potential buyers about Apothecare's business. The CIM draft explained EdgePoint's role in selling Apothecare. It stated that EPCA, not EPCH, had prepared the CIM and was "the Company's exclusive advisor in th[e] proposed transaction." The CIM explained that it was "solely for use by prospective purchasers considering acquiring the Company" and that Apothecare "reserves the right to negotiate with one or more prospective purchasers at any time and to enter into a definitive agreement for sale of the Company . . . ." (Emphasis added.) The CIM asked that "[p]arties interested in pursuing this transaction" specify their preferred "[d]eal structure (i.e., stock/asset)." It also stated that the existing Apothecare management team "intend[ed] to continue leading the growth of Apothecare to the extent desired by a buyer."

After reviewing the October 26 draft CIM with Dajie, Weinmann emailed a revised draft to Dajie on November 2. The November 2 draft also referred to EPCA and did not mention EPCH. Dajie and Weinmann agreed, due to concerns that Apothecare's financial records understated its accounts receivable, not to circulate the November 2 CIM to potential buyers until the CIM was

- 7 -

updated with new financial statements. The problems with Apothecare's accounts receivable were not fully resolved before Apothecare terminated its engagement with EPCH and the CIM was never shown to any potential investors.

Lazowski stated at his deposition that at some point between September 27 and October 27, 2016, he contacted Matthew Blevins, an employee at Clearview. Lazowski said that, without referring to Apothecare directly, he asked Blevins if Clearview would be "interested in a roughly 6 million dollar [Earnings Before Interest, Taxes, Depreciation, and Amortization] pharmacy/drug distribution business located east of the Mississippi." Between October 2016 and February 2017, EPCH contacted six additional companies as "potential investor[s] or purchaser[s]." It did not disclose the name of or confidential information about Apothecare to these companies. No additional potential buyers were contacted after February 2017.

On August 21, 2017, Apothecare sent EPCH a notice of its intent to terminate the Sell-Side Agreement.[3] EPCH did not respond.

---

[3] The letter stated:
Apothecare recognizes [that] the Agreement contemplates certain payments to EdgePoint could be required during the 18-month period following the termination of this agreement . . . if such sale occurs with a "Transactional Partner" . . . . As no "Transactional Partner" was identified or

- 8 -

B. Apothecare's Eventual Sale Independent of EdgePoint

On November 30, 2017, Dajie's estate planning attorney Christopher Graham had lunch with P.J. Smith, a managing director of Starboard to discuss an investment opportunity unrelated to Apothecare. At this lunch, Smith stated that Starboard was interested in investing in companies in the healthcare and pharmacy industries. Graham told Smith about Apothecare. This was the first time Starboard had heard of Apothecare. About one week later, on December 6, 2017, Smith of Starboard reached out to Clearview to see if it was interested in jointly investing in Apothecare.

On December 22, 2017, Starboard and Apothecare executed a non-binding Letter of Intent ("LOI") for an eventual acquisition of Apothecare. The LOI valued Apothecare at $47 million and "contemplated that the acquisition shall be primarily consummated

contacted by Seller or EdgePoint prior to the date of this notice of termination, the 18-month survival period is, for all intents and purposes, moot and without effect.
. . .
Mr. Dajie is not interested in selling Apothecare as originally contemplated back when the Agreement was entered into in September of 2016. . . . Unless I am advised otherwise, I will assume the contents of this letter are accepted and the Agreement shall be terminated effective as of September 22, 2017.

as an acquisition of the stock of Apothecare by a newly-formed entity established by the Buyer ('Newco')." Dajie would receive $36 million in cash plus $9 million of "junior participating preferred stock" in Newco. It also stated that the "Sellers" would be able to purchase a "pro rata share of the common stock" of Newco.

In January 2018, Starboard and Clearview executed a Co-Sponsorship Agreement for the acquisition of Apothecare. The transaction closed on July 17, 2018.

The transaction was structured such that the existing owners of Apothecare transferred their equity interests to AGD Investments Inc., a newly formed holding company, so that AGD Investments owned all of Apothecare. Another new entity, Apothecare Pharmacy Acquisition Corporation, then purchased $36 million of Apothecare's LLC units from AGD Investments. Apothecare Pharmacy Acquisition Corporation was wholly owned by Apothecare Pharmacy Holdings, LLC. Apothecare Pharmacy Holdings, LLC then bought the remaining units of Apothecare from AGD Investments in exchange for 9 million of its own units. Clearview acquired 64.48% of the membership units in Apothecare Pharmacy Holdings, LLC, Starboard acquired 5.47%, and AGD Investments acquired 30.05%. AGD Investments received $36 million, minus transaction costs and other adjustments, in cash and $9 million in LLC units.

## II. Procedural History

On September 18, 2018, EPCH filed a complaint in the Northern District of Ohio alleging that Apothecare had breached the Sell-Side Agreement by failing to pay the Success Fee. EPCH argued that it was entitled to the Success Fee under the tail provision because Apothecare's equity had been sold to Clearview and Starboard, both of which had been "identified" or "contacted" by EPCH. The complaint also alleged that EPCH was entitled to any costs and fees incurred in the lawsuit under the contract's indemnification clause.

On November 20, 2018, Apothecare filed a motion to dismiss for lack of jurisdiction and improper venue, or in the alternative to transfer venue. EPCH opposed the motion, which was granted as to the transfer. EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC, No. 1:18-CV-2155, 2019 WL 1255205, at *6 (N.D. Ohio Mar. 19, 2019). On March 19, 2019, the case was transferred to the District of Massachusetts. On May 2, 2019, Apothecare filed its answer and asserted various defenses.

On April 14, 2020, EPCH filed a motion for summary judgment on all claims and argued that Apothecare's affirmative defenses failed as a matter of law. Apothecare filed a cross-motion for summary judgment arguing (1) that EPCH's failure to register as a broker-dealer barred enforcement of the Sell-Side Agreement under Section 29(b) of the Exchange Act, which makes

voidable contracts "made" in or whose performance "involves" a violation of securities law,[4] (2) that EPCH was not entitled to a Success Fee because neither Clearview nor Starboard had been identified or contacted by EPCH as a "Transactional Partner," and (3) that the indemnification provision did not require Apothecare to pay legal fees that EPCH incurred in affirmatively suing Apothecare for breach of contract.

On May 4, 2020, Apothecare filed an amended answer adding an affirmative defense of fraudulent inducement alleging that Weinmann had misled Apothecare as to whether "EdgePoint" was a registered broker-dealer and member of FINRA. On June 15, 2020, EPCH filed a motion for summary judgment on this affirmative defense. Apothecare did not file a cross-motion for summary judgment on this defense.

The district court denied EPCH's motions for summary judgment. EdgePoint Cap. Holdings, LLC, 478 F. Supp. 3d at 81-84. It granted Apothecare's cross-motion for summary judgment as to each of EPCH's claims based on the following reasoning. It

---

[4]    Apothecare also argued that the Sell-Side Agreement was unenforceable under Massachusetts law. The Massachusetts Uniform Securities Act requires broker-dealers to register before effecting transactions in securities in Massachusetts. Mass. Gen. Laws ch. 110A, §§ 201, 401(c). Under Massachusetts law, "[n]o person who has made or engaged in the performance of any contract in violation of any provision of this chapter . . . may base any suit on the contract." Mass. Gen. Laws ch. 110A, § 410(g). Because we conclude that the contract is voidable under federal law, we do not reach this argument.

- 12 -

first rejected Apothecare's affirmative defense under Exchange Act Section 29(b). It determined that the contract was enforceable despite the fact that EPCH was not registered as a broker-dealer because EPCH did not in fact broker a securities transaction for Apothecare and "EPCH could have fulfilled its obligations without violating the securities laws by facilitating an asset sale." Id. at 81-82.

The district court next held as a matter of contract interpretation that EPCH was not entitled to the Success Fee because neither Clearview nor Starboard was properly considered a "Transactional Partner" in the context of the agreement. Id. at 83. It reasoned that "[t]he act of listing Clearview and Starboard among 300 entities or vaguely describing a look-alike to an associate in passing does not satisfy the Fee Tail Provision or entitle EPCH to compensation." Id.

The district court also concluded that EPCH, as an "unsuccessful plaintiff in this lawsuit," was not entitled to attorneys' fees because "[w]hen an indemnitee seeks to recover 'self-inflicted costs incurred in prosecuting affirmative claims against an indemnitor' . . . there is a 'strong argument that [the indemnitor] should not be required to reimburse attorneys' fees.'" Id. at 84 (second alteration in original) (quoting Caldwell Tanks, Inc. v. Haley & Ward, Inc., 471 F.3d 210, 217 (1st Cir. 2006)).

The district court did not reach Apothecare's fraudulent inducement defense. Id. EPCH timely appealed.

**III. Analysis**

We review the grant of summary judgment de novo, construing the record in the light most favorable to the non-moving party. Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013). "On an appeal from cross-motions for summary judgment, the standard does not change; we view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." Id. We may affirm a district court's decision on any ground supported by the record. Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st Cir. 2020).

EPCH argues on appeal that it is entitled to the Success Fee because it identified or contacted Clearview and Starboard. EPCH also argues that if it prevails on appeal, it is entitled to attorneys' fees and litigation expenses under the indemnification provision. Because we agree with Apothecare that the Sell-Side Agreement is voidable under Section 29(b) of the Exchange Act, the contract is unenforceable and EPCH cannot recover.

A. Statutory Background: Exchange Act Sections 15(a) and 29(b)

Section 15(a) of the Exchange Act states that it is unlawful for unregistered brokers to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. § 78o(a)(1). A "broker" is defined as "any

- 14 -

person engaged in the business of effecting transactions in securities for the account of others."[5]  15 U.S.C. § 78c(a)(4)(A).

"The broker-dealer registration requirement serves as the 'keystone of the entire system of broker-dealer regulation'" and "[a] broker-dealer that has registered with the [Securities and Exchange] Commission is bound to abide by numerous regulations

---

[5]  "[A] person may 'effect transactions'" "by assisting an issuer to structure prospective securities transactions, by helping an issuer to identify potential purchasers of securities, or by soliciting securities transactions."  SEC v. Morrone, 997 F.3d 52, 61 (1st Cir. 2021) (quoting Strengthening the Commission's Requirements Regarding Auditor Independence, Exchange Act Release No. 34-47265, 79 SEC Docket Nos. 1284, 1571, at *18 n.82 (Jan. 28, 2003)); see also SEC v. Mieka Energy Corp., 259 F. Supp. 3d 556, 561 (E.D. Tex. 2017); SEC v. Gagnon, No. 10-cv-11891, 2012 WL 994892, at *11 (E.D. Mich. Mar. 22, 2012); SEC v. Deyon, 977 F. Supp. 510, 518 (D. Me. 1997).  A broker also "effects" a transaction when it is involved in the negotiations between a purchaser and seller of securities.  Cornhusker Energy Lexington, LLC v. Prospect St. Ventures, No. 804CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006) (unpublished); 5 The Law of Securities Regulation § 14.63 (7th ed. May 2021 update).  The receipt of transaction-based compensation or holding oneself out as a broker-dealer further indicates that a party is engaged in the business of effecting transactions.  Morrone, 997 F.3d at 61 (citing Strengthening the Commission's Requirements Regarding Auditor Independence, 79 SEC Docket Nos. 1284, 1571, at *18 n.82); see also SEC v. Bio Def. Corp., No. 12-11669-DPW, 2019 WL 7578525, at *17-20 (D. Mass. Sept. 6, 2019); Cornhusker Energy Lexington, LLC, 2006 WL 2620985, at *6.  Transaction-based compensation is a "hallmark" indication that a party has acted as a broker and must register because it "represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent."  Legacy Res., Inc. v. Liberty Pioneer Energy Source, Inc., 322 P.3d 683, 688-89 (Utah 2013) (quoting Cornhusker Energy Lexington, LLC, 2006 WL 2620985, at *6).  In the transaction at issue, EdgePoint held itself out as a broker-dealer to Apothecare, agreed to identify and be involved in negotiations with purchasers, and was to receive transaction-based compensation.

designed to protect prospective purchasers of securities, including standards of professional conduct, financial responsibility requirements, recordkeeping requirements, and supervisory obligations over broker-dealer employees." Roth v. SEC, 22 F.3d 1108, 1109 (D.C. Cir. 1994); see also, e.g., FINRA Rule 2010; FINRA Rule 2210(d)(1); FINRA Rule 4513.

As the Fifth Circuit said in Eastside Church of Christ v. National Plan, Inc., "[t]he requirement that brokers and dealers register is of the utmost importance in effecting the purposes of the [Exchange Act]." 391 F.2d 357, 362 (5th Cir. 1968); see also Roth, 22 F.3d at 1109; Turbeville v. FINRA, 874 F.3d 1268, 1270 (11th Cir. 2017) (explaining that the Exchange Act requires registered brokers to comply with "conduct rules 'designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . [and] to protect investors and the public interest'" (quoting 15 U.S.C. § 78o-3(b)(6))). "It is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records." Eastside Church of Christ, 391 F.2d at 362. Registration ensures that sellers of securities "understand[] and appreciate[] both the nature of the securities [they] sell[] and [their] responsibilities to the investor[s]." Roth, 22 F.3d at 1109.

- 16 -

An entity "attempts" to induce the sale of securities and therefore must register when it publishes advertisements for securities or contacts potential buyers to solicit investment. See, e.g., SEC v. Nutra Pharma Corp., 450 F. Supp. 3d 278, 291 (E.D.N.Y. 2020) (holding that the SEC adequately alleged a violation of Section 15(a) where its complaint stated that defendant had "induced or attempted to induce the purchase or sale of securities by calling investors, mailing invitations to promotional events, and attending dinners and lunches and making promotional pitches"); SEC v. Schmidt, No. 71 Civ. 2008, 1971 WL 293, at *1-2 (S.D.N.Y. Aug. 26, 1971); In re First Cap. Funding, Inc., Exchange Act Release No. 30,819, 50 SEC 1026, 1027-28 (June 17, 1992) (explaining that transmitting a "pre-qualification form" to potential investors describing investment opportunity and including "language of solicitation" was an attempt to induce the purchase or sale of securities).

Section 29(b) of the Exchange Act states that "[e]very contract made in violation of any provision of this chapter . . . and every contract . . . the performance of which involves the violation of or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b). As

- 17 -

stated by the Supreme Court in Mills v. Electric Auto-Lite Co., Section 29(b) does not immediately void the contract at issue; instead the contract is "voidable at the option of the innocent party." 396 U.S. 375, 387-88 (1970).

A party seeking to void a contract under Section 29(b) must show (1) that it is in contractual privity with the opposing party, (2) that it is within the class of people that the securities acts were designed to protect, and (3) that the contract involved a prohibited act. See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 205 (3d Cir. 2006); Reg'l Props. Inc. v. Fin. & Real Est. Consulting Co., 678 F.2d 552, 559 (5th Cir. 1982). There is no dispute that Apothecare was in privity with EPCH or that Apothecare is among the class of persons intended to be protected by the securities acts. See Eastside Church of Christ, 391 F.2d at 362 (holding that issuer of bonds sold by unregistered broker was within the class of persons meant to be protected by Section 15(a)'s registration requirements).

Section 29(b) is not limited to voiding contracts which "on their face" violate the Exchange Act. See Reg'l Props. Inc., 678 F.2d at 560 ("A statute that voided only contracts by which persons have agreed in express terms to violate the Act would be so narrow as to be a waste of the congressional time spent in its enactment."). There is also no requirement that the contract's making or performance "necessarily" required a violation of the

- 18 -

Exchange Act. See id. at 560-61 ("That these contracts, under different circumstances, could have been performed without violating the [Exchange Act] is immaterial."). Instead, a contract may be voidable under Section 29(b) if its performance in fact involved a violation of the Exchange Act. See id.

B. The Sell-Side Agreement is Voidable under Section 29(b)

We agree with Apothecare that the contract is voidable and hold that EPCH's performance of the Sell-Side Agreement involved a "practice in violation of [the Exchange Act]," specifically "induc[ing], or attempt[ing] to induce the purchase or sale of any security" as an unregistered broker. 15 U.S.C. §§ 78o(a)(1), 78cc(b).

EPCH states that after drafting the CIM, it contacted seven companies, including Clearview, as "potential investor[s] or purchaser[s]" of Apothecare. From the text of the Sell-Side Agreement, the CIM, and deposition testimony from EPCH employees, it is clear that these contacts were an attempt to induce the purchase or sale of Apothecare's equity. The Sell-Side Agreement explicitly contemplated the sale of securities, stating that EPCH would attempt to sell "all or part of the Company" and any affiliates, which would include any holding company. The CIM was a further elucidation of the proposed sale and confirmed that the deal included a possible sale of securities. The CIM stated that Apothecare was looking for a prospective buyer "of the Company,"

that buyers could specify if they were interested in a "stock" transaction, and falsely listed EPCA as Apothecare's representative, which would wrongly reassure potential buyers that a registered broker was at that time handling the purchase and sale. Weinmann also testified that EPCA maintained its broker-dealer registration in Massachusetts "because of the Apothecare engagement," and that EPCH was prepared to assign the contract to EPCA at any time.

The fact that Apothecare is an LLC, whose units are not always classified as securities under the Exchange Act, does not alter our conclusion that EPCH attempted to induce the sale of securities. LLC units can be classified as securities, so depending on the deal structure, the sale of Apothecare's LLC units could have been a securities transaction. See 15 U.S.C. § 77b; Affco Invs. 2001, LLC v. Proskauer Rose, LLP, 625 F.3d 185, 189 (5th Cir. 2010) (holding that ownership interests in an LLC were securities under the Exchange Act). Further, any equity transaction between Apothecare and a purchaser was likely to be a complex transaction involving the purchase or sale of holding corporation stock or other securities. This is evidenced by the fact that the Sell-Side Agreement explicitly discussed the possibility that Apothecare would be sold alongside "all related affiliates," and that the CIM asked potential investors to indicate whether they were interested in a "stock" transaction.

Nor does the fact that a buyer could have requested that the sale be completed as an asset sale create a safe harbor for EPCH. Requiring registration even when the ultimate form of the transaction is uncertain not only serves the statutory purposes of protecting investors but also ensures that brokers comply with FINRA's codes of conduct, meant to effect the statutory purposes, from their first contact with potential purchasers of securities. See, e.g., FINRA Rule 2210(d)(1)(B) (prohibiting brokers from predicting or projecting performance of a security or making any "exaggerated, unwarranted, promissory or misleading statement or claim"); FINRA Rule 2010 (requiring FINRA members to "observe high standards of commercial honor and just and equitable principles of trade"); FINRA Rule 4513 (requiring registered brokers to keep records of any complaints made "in connection with the solicitation . . . of any transaction").

That EPCH is able to assign contracts to EPCA does not change that EPCH was required to register. When EPCH solicits purchasers, it at least "attempt[s] to induce" and arguably also "induce[s]" the sale of securities regardless of any subsequent assignment to EPCA. 15 U.S.C. § 78(o)(a)(1); See SEC v. Morrone, 997 F.3d 52, 61 (1st Cir. 2021); Cornhusker Energy Lexington, LLC v. Prospect St. Ventures, No. 804CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006) (unpublished); SEC v. Mieka Energy Corp., 259 F. Supp. 3d 556, 561 (E.D. Tex. 2017); see also In re Baker & Getty

- 21 -

<u>Fin. Servs., Inc.</u>, 106 F.3d 1255, 1261 (6th Cir. 1997) (explaining in bankruptcy context that a broker "effects" transactions when it acts as an "essential link in the chain of distribution"). Section 15(a)'s text and purpose make clear that the registration requirement applies as soon as a broker attempts to induce a securities transaction, and EdgePoint's plan to assign the Apothecare contract from EPCH to EPCA does not release it from the requirements of the Exchange Act during the "inducement" phase of a transaction.

EPCH makes several counterarguments, none of which is persuasive. Its lead argument is that it has a safe harbor as to whether the contract was "made" in violation of securities law as long as it was possible that the sale of Apothecare would not involve a sale of securities. This argument relies on a misreading of <u>Berckeley Investment Group, Ltd.</u> v. <u>Colkitt</u>, and fails for several reasons.[6] As a threshold matter, the argument is

---

[6] The <u>Berckeley</u> decision is factually and legally distinct. The case involved a contract for a loan between two parties and the security for the loan. <u>Berckeley Inv. Grp., Ltd</u>, 455 F.3d at 198. Plaintiff Berckeley purchased from defendant Colkitt debentures which could be converted into unregistered stock. <u>Id.</u> at 199. At issue was whether Section 29(b) would allow Colkitt to void the loan agreement if a trier of fact determined that Berckeley, after converting the debentures, had illegally sold those unregistered securities. <u>Id.</u> at 206-07. The court held that it would not. <u>Id.</u> at 207.

In <u>Salamon</u> v. <u>Teleplus Enterprises Inc.</u>, the District of New Jersey also rejected the argument that <u>Berckeley</u> held that Section 29(b) voided only those contracts which "are inherently unlawful and could not, in any circumstances, be performed in a

immaterial because we conclude the contract's performance involved a violation of the Exchange Act, not that the contract was "made" in violation of the Exchange Act.  Further, the mere fact that it is possible to legally perform a contract does not mean the contract was not made in violation of securities law.  See Indus Partners, LLC v. Intelligroup, Inc., 934 N.E.2d 264, 265 n.1, 271 (Mass. App. Ct. 2010) (holding that a contract was made in violation of securities law where it required an unregistered broker to advise on a "possible Transaction" and "'Transaction' was defined to include, among other things, the 'sale or other transfer, directly or indirectly of all or any portion of the assets or securities . . . of Intelligroup'" (emphasis added)); see also Cornhusker Energy Lexington, LLC, 2006 WL 2620985, at *6.

If EPCH also means to argue that a contract is not voidable -- despite its performance involving a violation of the Exchange Act -- unless the contract "necessarily" required a violation of securities law, that argument also fails.  Berckeley does not hold that a contract is only voidable if its performance necessarily required a violation of the Exchange Act.  Instead, it holds that a contract is voidable if the contract "involved a prohibited transaction" and there was "a direct relationship between the violation at issue and the performance of the contract;

legal manner."  No. 05-2058, 2008 WL 2277094, at *6-7 (D.N.J. June 2, 2008) (unpublished).

i.e., the violation must be 'inseparable from the performance of the contract' rather than 'collateral or tangential to the contract.'"  Berckeley, 455 F.3d at 205.[7]  Berckeley also approvingly cited Regional Properties, in which the Fifth Circuit explained that Section 29(b) voids contracts "that are illegal when made or in fact performed" and rejected any argument that only contracts which "by their terms" "necessarily" required the violation of the Exchange Act were voidable.  Reg'l Props. Inc., 678 F.2d at 560.  Our holding is consistent with Berckeley and Regional Properties.  EPCH's attempts to induce the sale of securities were inseparable from the contract's central purpose of selling Apothecare and the Sell-Side Agreement was illegal as in fact performed.[8]

---

[7]    The Berckeley court then explained that when a contract "could [not] be performed without violating the securities laws," that was a circumstance in which the violation was "inseparable" from the contract.  455 F.3d at 206.

[8]    EPCH also relies on NTV Management Inc. v. Lightship Global Ventures, 140 N.E.3d 436 (Mass. 2020), in which the Massachusetts Supreme Judicial Court held that unregistered broker NTV Management Inc. did not "make" a contract in violation of securities law, because the contract did not "require[] NTV to act as a broker-dealer."  Id. at 444.  The contract at issue in NTV provided that "NTV was to 'source capital and structure financing transactions from agreed-upon target investors and/or lenders,' and that 'NTV expect[ed] to introduce and facilitate investment from third party sources collectively able to finance all levels of the transactions (i.e., both equity and debt).'"  Id. at 446.

NTV presented a different set of facts and a different legal question.  In NTV the parties agreed to limit the analysis to whether the contract on its face was made in violation of securities law and no evidence was presented as to whether

- 24 -

EPCH's suggestion that we read Section 29(b) to void contracts only when their performance necessarily involves a violation of securities law would also defeat the purposes of the Exchange Act. Section 29(b) does not include the word "necessarily" and we are precluded from inserting such language. See Reg'l Props. Inc, 678 F.2d at 560.

EPCH next argues that the final transaction between Apothecare, Clearview, and Starboard was a sale of non-security LLC units and thus the performance of the Sell-Side Agreement could not have "involved" a sale of securities. We reject this argument. Whether EPCH attempted to induce the sale of securities under the Sell-Side Agreement does not turn on whether the later transaction -- in which EPCH was not involved -- was ultimately completed as a securities transaction.

EPCH also argues that a possible later assignment of the Sell-Side Agreement to EPCA, as was its practice should it choose to do so, would not undercut the purposes of the registration requirement.[9] EPCH contends that the close relationship between

_____

performance involved NTV attempting to broker a securities transaction. Id. at 444 n.17. Again, in this case we conclude that EPCH's performance of the Sell-Side Agreement involved impermissible conduct and there is significant evidence that EPCH attempted to induce the purchase or sale of securities.

NTV's interpretation of federal securities law is also not binding on this court. Cf. Elkins v. United States, 364 U.S. 206, 224 (1960).

[9] EdgePoint has not established that it would be able to

EPCH and EPCA meant "there was no danger that a transaction would be brokered by someone who did not know what he or she was doing." The language of the statute forecloses this argument. The purposes of registration also go far beyond ensuring that broker-dealers are educated. Registered broker-dealers have record-keeping, record-retention, and financial responsibility requirements, must follow standards of professional conduct, and are subject to self-regulation. See Roth, 22 F.3d at 1109; 15 U.S.C. §§ 78(q), 78o. These requirements protect both the public and the markets. See United Hous. Found., Inc. v. Forman, 421 U.S. 837, 849 (1975); 15 U.S.C. §§ 78b; 78o-3(b)(6). Despite their close relationship, EPCH and EPCA are legally distinct entities subject to different regulation at every stage of a transaction.

We respond to a final argument suggested in EPCH's brief. The argument is that factually the cases cited earlier in this opinion do not go so far as to establish that EPCH's actions in this transaction, which was at the preliminary stages, violated securities law. After all, the argument would go, EPCH's

---

freely assign this contract for professional services without Apothecare's approval. See 29 Williston on Contracts § 74:30 (4th ed. June 2021 update) ("A contractual duty is personal, and performance of it cannot be delegated where, for example . . . professional services are contracted for."); id. at § 74:28 ("Contractual duties are . . . not delegable if they involve the personal qualities or skills of the obligor."). Its conclusory statement that contracts are, in general, freely assignable is insufficient.

representatives had done nothing more than make some phone calls to identify potential buyers in furtherance of effecting a transaction that might involve the transfer of securities but did not certainly involve such a transaction. EPCH's suggested argument conveniently ignores that it is the very contract with EPCH which is the basis for its claim for damages against Apothecare.

Regardless, we believe the policies behind the securities statutes, the cases articulating those policies, and the FINRA rules effectuating those policies would lead us to the same conclusion. EdgePoint knew it was attempting to induce a type of transaction expressly contemplated to include a possible securities transaction and chose to do it using its unregistered arm. The policies described above impose the risk of the transaction on EdgePoint, not Apothecare.

Because we conclude that the Sell-Side Agreement is voidable, Apothecare is not required to pay either the Success Fee or EPCH's litigation expenses as outlined in the indemnification provision.

## IV. Conclusion

The grant of summary judgment for Apothecare is <u>affirmed</u>.